**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KIMBERLY BELTON,
Plaintiff,
v.
ALLEGHENY GENERAL HOSPITAL,
Defendant.

2:23-cv-776-NR

**MEMORANDUM ORDER**

Plaintiff Kimberly Belton was a Registered Nurse, employed by Defendant Allegheny General Hospital. She claims that after she took leave for the birth of her child under the Family Medical Leave Act, the circumstances of her employment with Allegheny General worsened. She says that before taking leave, Allegheny General consistently rated her as a high performer. And because she was a high performer, Allegheny General promoted her twice and gave her more managerial responsibilities. But that all changed when she returned to work after taking leave.

Upon returning, Ms. Belton claims her supervisor started deriding and belittling her in nearly every interaction. This treatment led to a meeting during which Ms. Belton was presented with a Hobson's choice—either resign or face demotion and discipline. In response, Ms. Belton felt like she had to resign.

As a result of her experience, Ms. Belton filed this action. She alleges claims for disparate treatment and hostile work environment in violation of Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act, and retaliation claims under Title VII, the PHRA, and the FMLA.

Allegheny General, for its part, argues that all these claims should be dismissed. It says that Ms. Belton failed to exhaust her administrative remedies for her retaliation claims under Title VII and the PHRA. It also argues that Ms. Belton hasn't alleged sufficient facts to support a finding of constructive discharge, and since

that's the only adverse employment action alleged in the complaint, her disparate treatment, hostile work environment, and retaliation claims should all be dismissed. Finally, it argues that even taking Ms. Belton's allegations as true, what she has alleged falls far short of establishing a hostile work environment.

After careful review, the Court grants in part and denies in part Allegheny General's motion to dismiss. Ms. Belton has exhausted her retaliation claims. And applying the proper analytical standard, Ms. Belton has adequately pled that she was constructively discharged. However, the facts in her complaint, as currently pled, cannot support a hostile work environment claim. Thus, the Court dismisses that claim, but does so without prejudice because it is unclear whether amendment would be futile.

## BACKGROUND

Ms. Belton began working at Allegheny General in 2008 as a Registered Nurse. ECF 1, ¶ 7. She was promoted twice—once to Assistant Nurse Manager in 2018, and then to Nurse Manager in 2019. *Id.* ¶ 8. During this period, Ms. Belton was "consistently rated as a dedicated high performer" by her supervisors. *Id.* ¶ 12.

In early 2021, Ms. Belton took FMLA leave for the birth of her child. *Id.* ¶ 14. When she returned to work, Ms. Belton claims that Allegheny General's attitude toward her had changed dramatically. *Id.* ¶ 15. Colleen Reynolds, the Director of Nursing and Ms. Belton's mentor, "began deriding and belittling her almost immediately on her return." *Id.* ¶ 16. Ms. Reynolds told her that "it was entirely [Ms.] Belton's fault that her units were understaffed," "her 'communication style' was ineffective," she "wasn't being receptive," and she was being "standoffish." *Id.* ¶¶ 17-19. According to Ms. Belton, between her return to work and October 2021, "nearly every interaction between [Ms.] Belton and [Ms.] Reynolds involved harsh and unjustified denigration of [Ms.] Belton's ability and leadership." *Id.* ¶ 20.

Along with these vocal criticisms, Ms. Reynolds "would ignore and disregard [Ms.] Belton's contributions in management meetings, instead deferring to her less qualified male assistant managers." *Id.* ¶ 22. This treatment left Ms. Belton feeling increasingly distraught and anxious. *Id.* ¶ 21.

Matters only got worse after Ms. Belton took time off because of a positive COVID-19 test. *Id.* ¶ 23. When Ms. Belton recovered, Ms. Reynolds "verbally attacked" her for not being vaccinated. *Id.* ¶ 24. Ms. Belton chose not to get the vaccine because she was breastfeeding her child, which Ms. Reynolds knew. *Id.* ¶ 25.

Tired of this treatment, Ms. Belton scheduled a meeting with Margaret DiCuccio, Allegheny General's Chief Nursing Officer. *Id.* ¶ 26. At that meeting, Ms. Belton "explained that, although she loved her job and had no desire to leave, … her relationship with [Ms.] Reynolds appeared to be broken and counterproductive, … her work environment had become intolerably hostile because of [Ms.] Reynold[s] unrelenting and baseless complaints[.]" *Id.* ¶ 28. She then asked if she could change to whom she reported. *Id.* ¶ 29. Ms. DiCuccio responded by saying: "It sounds like when people in authority tell you to do something it makes you uncomfortable[,]" and "I need you to do what [Ms. Reynolds] tells you to." *Id.* ¶ 30.

Two workdays after this meeting, Ms. Belton was called into a meeting with Ms. Reynolds and a Human Resources representative. *Id.* ¶ 32. At that meeting, Ms. Reynolds told Ms. Belton that she could "accept a demotion, be subjected to discipline, or resign." *Id.* ¶ 33. Ms. Belton chose to resign. *Id.* ¶ 34.

After resigning, Ms. Belton filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission. ECF 5-1. The description of her claim in the Charge mirrors the allegations in her complaint. *See id.*

## DISCUSSION & ANALYSIS

### I. Ms. Belton has exhausted her retaliation claims.

Allegheny General argues that Ms. Belton failed to exhaust her administrative

remedies for her retaliation claims under Title VII and the PHRA for two reasons.[1] ECF 6, p. 4. First, it argues that Ms. Belton "limited the scope of her Charge to sex and FMLA discrimination" because she failed to check the "Retaliation" box on the first page of the Charge and did not otherwise explicitly reference retaliation in the description of her claim. *Id.* at pp. 4-5. Second, it argues that even if Ms. Belton had made it clear that a retaliation claim was within the scope of her Charge, she failed to identify a protected activity. *Id.* at p. 3. The Court rejects both arguments.

Prior to bringing a claim under either Title VII or the PHRA, a plaintiff must "exhaust all required administrative remedies before bringing a claim for judicial relief." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013). "A claim has been administratively exhausted when the specifics of a charge with the administrative agency fairly encompass a claim and would put the agency and the defendant employer on notice of that claim." *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 600-01 (E.D. Pa. 2015) (cleaned up). In such a case, the verified EEOC Charge controls the analysis.[2] But in conducting that analysis, courts "give the EEOC charge a fairly liberal construction and concentrate on the facts asserted therein." *English v. Turn 5, Inc.*, No. 19-5277, 2020 WL 6118780, at *4 (E.D. Pa. Oct. 16, 2020) (cleaned up).

Contrary to Allegheny General's first argument, Ms. Belton's retaliation claims are reasonably within the scope of her Charge. In the Charge, she alleges that after taking FMLA leave for her pregnancy, "she discovered that AGH's attitude to

---

[1] This exhaustion argument does not apply to Ms. Belton's claim under the FMLA in Count II.

[2] The Court can consider the EEOC Charge without converting the motion to a motion for summary judgment. *See Pekar v. U.S. Steel/Edgar Thomson Works*, No. 09-844, 2010 WL 419421, at *4-5 (W.D. Pa. Jan. 29, 2010) (Fischer, J.) ("EEOC and PHRC documents" are "matters of public record and may be considered by the Court without converting the motion to one for summary judgment" (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

[sic] her had changed dramatically." ECF 5-1, ¶ 10. Ms. Reynolds, her supervisor and former mentor, "began deriding and belittling her almost immediately on her return" and continued to do so in "nearly every interaction." *Id.* ¶ 11, 14. Ms. Reynolds also started "ignor[ing] and disregard[ing] Ms. Belton's contributions in management meeting[s], instead deferring to her less qualified male assistant." *Id.* ¶ 15. Eventually tired of this treatment, Ms. Belton scheduled a meeting with the Chief Nursing Officer so that she could raise an informal complaint about her situation.

Thus, although Ms. Belton did not use the word "retaliation" in her Charge, the fact that she alleges the conditions of her employment changed after taking leave for her pregnancy, her supervisor preferred the perspective of male employees, and she raised an "unanswered informal complaint," "not only put [Allegheny General] on notice of a possible retaliation claim, but … would also lead a proper EEOC investigation to reveal that a claim of retaliation was within the scope of [Ms. Belton's] PHRC Charge of Discrimination." *English*, 2020 WL 6118780, at *5.

Allegheny General's related, but separate, argument that Ms. Belton's informal complaint to the Chief Nursing Officer was not a "protected activity" is similarly misplaced. To begin, "informal protests of discriminatory employment practices, including making complaints to management[,]" qualify as a protected activity in the form of opposition to an unlawful employment practice. *Moore v. City of Phila.*, 461 F.3d 331, 343 (3d Cir. 2006). And again, a fair inference from the allegations in the Charge is that Ms. Belton complained about how her employment conditions changed after she took pregnancy leave—thus connecting the difference in treatment to her sex. Indeed, on the Charge itself, Ms. Belton checked the box for discrimination on the basis of "sex." ECF 5-1.

For these reasons, the Court finds that Ms. Belton sufficiently exhausted her retaliation claims.

## II. Ms. Belton has failed to allege sufficient facts to state a claim for hostile work environment.

Ms. Belton brings a claim for hostile work environment claim. Allegheny General argues that Ms. Belton failed to allege sufficient facts to support that claim. The Court agrees.

To establish a hostile work environment, Ms. Belton must plead facts that show her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment[.]" *Betz v. Temple Health Sys.*, 659 F. App'x 137, 142 (3d Cir. 2016) (cleaned up). This is a difficult standard to meet. To meet it, Ms. Belton must plead facts that could plausibly "establish that 1) [she] suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected [her], 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel*, 706 F.3d at 167.

In applying this standard, the Court must consider the "totality of the circumstances," including "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93 (3d Cir. 2014) (cleaned up). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up).

Ms. Belton's allegations fall short of this high threshold. She claims that her supervisor told her that it was her "fault that her units were understaffed," her "communication style was ineffective," accused her of "being standoff-ish," would

"ignore and disregard [her] contributions in management meetings," and "verbally attacked [her] for not having been vaccinated" against COVID-19. ECF 1, ¶¶ 17-24. These kinds of characteristic-neutral comments criticizing her work performance are "not, objectively speaking, the kind of conduct that could destroy completely the emotional and psychological stability of someone." *Wright v. Providence Care Ctr., LLC*, No. 17-747, 2019 WL 4643592, at *12 (W.D. Pa. Sept. 24, 2019) (Ranjan, J.) (cleaned up), *aff'd,* 822 F. App'x 85 (3d Cir. 2020). Instead, they hew closer to the kind of "rude and condescending" behavior that courts hold is not severe enough to support a hostile work environment claim. *Id.*; *see also Newsome v. City of Philadelphia*, 500 F. Supp. 3d 336, 343 (E.D. Pa. 2020) ("Plaintiff did not plead facts that suggested reactions toward her pumping needs—although offensive—went beyond inconvenience, impatience, or irritation at best.").

But even though this conduct might not be severe enough to support a claim, if it's "pervasive" enough, it could still allow Ms. Belton to proceed to discovery. *See Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017). That is, "severity and pervasiveness are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* (cleaned up). That said, the Court cannot make a pervasiveness determination here because there are crucial details missing from the complaint.

The key allegation on the pervasiveness of the alleged hostile conduct is that "[b]etween [Ms.] Belton's return to work and October 2021, nearly every interaction between [Ms.] Belton and [Ms.] Reynolds involved harsh and unjustified denigration of [Ms.] Belton's ability and leadership." ECF 1, ¶ 20. This allegation falls short.

There's nothing in the complaint to define the relevant period because Ms. Belton has not pled when she returned from FMLA leave. Did this conduct persist for a few short weeks or for several months? Not only that, but Ms. Belton also doesn't

provide the Court with any way of knowing how often interacted with Ms. Reynolds. Was it every day? Once a week? Once a month? Without this information, the Court cannot determine either the "frequency of the discriminatory conduct" or whether "it unreasonably interfere[d] with [Ms. Belton's] work performance," as required under the totality of the circumstances analysis. *See Castleberry*, 863 F.3d at 264.

For these reasons, the Court grants the motion to dismiss Ms. Belton's hostile work environment claim. It does so, however, without prejudice and grants her leave to amend because it's unclear whether Ms. Belton could add the necessary detail to her allegations to adequately state this claim.[3]

**III. Ms. Belton has adequately stated sex and pregnancy discrimination claims based on her constructive discharge.**

Allegheny General next argues that Ms. Belton's claims for sex and pregnancy discrimination fail because she did not plausibly allege that she suffered an adverse employment action. ECF 6, p. 6. The Court disagrees.

The adverse employment action at issue here is Ms. Belton's "constructive discharge." *Id.*; ECF 1, ¶¶ 33-34. Allegheny General says that constructive discharge "resulted from" a hostile work environment. ECF 6, p. 6. Allegheny General presumably seeks to frame the claim that way because "[w]hen a plaintiff's claim of constructive discharge is based on an alleged hostile work environment, the 'hostile work environment is a necessary predicate to a hostile-environment constructive discharge case.'" *Perez v. RHP Staffing Co.*, No. 21-1314, 2021 WL 4583850, at *6 (E.D. Pa. Oct. 6, 2021) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004)). But such a compound claim is only one type of constructive discharge. *See Stremple v. Nicholson*, 289 F. App'x 571, 574 (3d Cir. 2008). "A plaintiff can prove constructive

[3] Should Ms. Belton try to amend her claim for a hostile work environment, she should be mindful that she must plead facts that would allow the Court to connect the harassment and her protected characteristic. *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023).

discharge independent of a hostile work environment based on the actions of a supervisor." *Boandl v. Geithner*, 752 F. Supp. 2d 540, 573 (E.D. Pa. 2010).

So, the question becomes: Which type of constructive discharge claim is Ms. Belton alleging in her complaint?

Liberally construing her allegations, the Court concludes that she is alleging a constructive discharge separate from her hostile work environment. Ms. Belton alleges that "[t]he conduct of [Allegheny General] and it's [sic] supervisors … subjected [Ms.] Belton to disparate treatment in the terms and conditions of her employment on the basis of her sex and pregnancy, unreasonably interfering with her ability to perform her job, ***and*** created an intimidating, humiliating, and hostile work environment in violation of Title VII." ECF 1, ¶ 38 (emphasis added). It's clear from the use of the conjunctive "and" in this paragraph that Ms. Belton is attempting to allege two distinct types of claims under Title VII. And at no point does Ms. Belton explicitly link her resignation to her hostile work environment. It can therefore be fairly said that Ms. Belton is bringing a supervisor-based constructive discharge claim.

This type of constructive discharge claim "will be found where the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Lanza v. Postmaster Gen. of the U.S.*, 570 F. App'x 236, 240 (3d Cir. 2004) (cleaned up). The Third Circuit has laid out several factors that may point to a constructive discharge: "(1) threat of discharge; (2) suggesting or encouraging resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; and (6) unsatisfactory job evaluations." *Lebofsky v. City of Phila.*, 394 F. App'x 935, 939 (3d Cir. 2010) (citation omitted). In sum, the facts "should demonstrate that when the plaintiff resigned, he was fleeing from a stick and not

reaching for a carrot." *Nolle v. Guitar Ctr.*, No. 11-1503, 2012 WL 4857791, at *3 (W.D. Pa. Oct. 12, 2012) (Hornak, J.).

Typically, "the question of whether the alleged conditions were so intolerable a reasonable person in [plaintiff's] position would have felt compelled to resign" is "a fact intensive inquiry that is not amenable to resolution at the motion to dismiss stage." *Johnson v. York Acad. Reg'l Charter Sch.*, No. 1:23-cv-17, 2023 WL 6448843, at *6 (M.D. Pa. Oct. 3, 2023) (cleaned up). That is especially the case when the plaintiff has pled facts that satisfy several of the above factors, as Ms. Belton has done here.

Most notably, Ms. Belton alleged that Ms. Reynolds suggested that Ms. Belton resign or otherwise face a demotion and disciplinary action. ECF 1, ¶ 33. Such a dilemma could cause a reasonable person to resign and pursue opportunities elsewhere. *Johnson*, 2023 WL 6448843, at *6 ("[W]e find that Johnson has sufficiently alleged she was presented with only two options—to resign or to work on her Sabbath in violation of religious beliefs. … [I]t is our view that the complaint sufficiently alleges that Johnson was left with this binary choice and as a result, was constructively discharged."). But that's not all, Ms. Belton also alleged that Ms. DiCuccio, the Chief Nursing Officer, refused Ms. Belton's request to be supervised by someone other than Ms. Reynolds, even after she complained about being "relentlessly belittled and subjected to increasing harsh and baseless criticisms[.]" ECF 1, ¶¶ 26-30. How a reasonable person would respond to such circumstances is not a definitive determination the Court can make at this early stage.

Consequently, "[r]ecognizing the fact-specific nature of this claim," at the pleading stage, the Court finds that Ms. Belton "has asserted sufficient well-pleaded facts for this claim to proceed forward." *Johnson*, 2023 WL 6448843, at *6; *see also O'Day v. Wilkes-Barre Area Sch. Dist.*, No. 22-921, 2023 WL 4306749, at *5 (M.D. Pa. June 30, 2023) ("[T]here is evidence stated in the amended complaint to suggest that

the School District threatened to discharge O'Day, subjected him to a termination of healthcare insurance benefits, and subjected him to altered job responsibilities. Therefore, the Court finds it plausible, at least for the purposes of a motion to dismiss, that a reasonable person subject to these conditions would resign. Thus, O'Day sufficiently states a claim for constructive discharge." (cleaned up)).

**IV. Ms. Belton has sufficiently alleged a constructive discharge to support her retaliation claims.**

Allegheny General's last argument is that Ms. Belton's retaliation claims under Title VII, the PHRA, and the FMLA all fail because Ms. Belton "has not plausibly alleged constructive discharge" so she "cannot prove that she suffered an adverse employment action," as required by all of the statutes. ECF 11, p. 5. As discussed above, however, Ms. Belton has sufficiently alleged a constructive discharge, so the Court rejects this argument.

*   *   *

For these reasons, this **22nd day of November, 2023**, it is hereby **ORDERED** that Allegheny General's motion to dismiss (ECF 5) is **GRANTED in part and DENIED in part**. The Court grants the motion as to Ms. Belton's hostile work environment claim and dismisses that claim without prejudice. The Court denies the motion in all other respects.

BY THE COURT:

/s/ J. Nicholas Ranjan
United States District Judge